896 F.Supp. 771 (1995)
Keith LESLIE, Plaintiff,
v.
William J. DOYLE, Defendant.
No. 93 C 7513.
United States District Court, N.D. Illinois, Eastern Division.
August 9, 1995.
Opinion Supplementing Decision August 10, 1995.
*772 Stephen Libowsky and Orrin Shifrin, Katten, Muchin & Zavis, Chicago, IL, for plaintiff.
Sebastian Danziger, Chicago, IL, for defendant.

MEMORANDUM OPINION AND ORDER
SHADUR, Senior District Judge.
This Court's November 23, 1994 memorandum opinion and order (the "Opinion," 868 F.Supp. 1039[1] (N.D.Ill.1994)) granted in principal part the motion to dismiss the 42 U.S.C. § 1983 ("Section 1983") action that had been brought by Keith Leslie ("Leslie") against three Illinois Department of Corrections employees, but Opinion at 1042-44 kept alive Leslie's claim that Joliet Correctional Center ("Joliet") Reception and Classification Center Superintendent William Doyle ("Doyle") had gratuitously placed Leslie in segregative confinement for no reason at all. Following the issuance of the Opinion the parties brought that surviving claim into a posture of readiness for prompt trial.
But after the Supreme Court had then issued its end-of-Term opinion in Sandin v. Conner, ___ U.S. ___, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), Doyle's counsel filed a motion for summary judgment. Leslie's appointed counsel have filed a response,[2] and with the parties thus having joined issue the motion is ripe for decision.
To begin with, Doyle quarrels substantively with this Court's invocation of Bell v. Wolfish, 441 U.S. 520, 558-60, 99 S.Ct. 1861, 1884-85, 60 L.Ed.2d 447 (1979) as the predicate for finding that Leslie has a constitutionally-viable Fourth Amendment[3] claim against Doyle (Opinion at 1044 quoted the premise in Bell, 441 U.S. at 558, 99 S.Ct. at 1884, "that inmates ... retain some Fourth Amendment rights upon commitment to a corrections facility"). This Court has examined the cases that Doyle cites and more (and it had done so before issuing the Opinion), and it remains of the view expressed in Opinion at 1044:
Although custody in prison is by definition an entirely reasonable "seizure" of a convicted felon (if it may be termed a "seizure" at all in that sense), it may fairly be argued that the constitutional right to be free from unreasonable seizures (the Fourth Amendment right) embraces an inmate's entitlement not to be subjected to a major further limitation on his libertya commitment to segregationon the mere whim of a correctional officer (for no penological purpose at all).
*773 What now forces a difference in that result, however, is the decision in Sandin. As the just-quoted language from the Opinion reflects (and as is evident from the fact that the fount of any constitutional deprivation by state actors must be the Fourteenth Amendment, even though a Bill of Rights provision is cited for shorthand purposes), a necessary ingredient of Leslie's claim is Doyle's imposition of "a major further limitation on his [Leslie's] libertya commitment to segregation." But the 5-to-4 decision in Sandin has just announced that State-created "liberty interests which are protected by the Due Process Clause" (___ U.S. at ___, 115 S.Ct. at 2300) are "generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidence of prison life" (id.). Because "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law" (id. at ___, 115 S.Ct. at 2301), the Supreme Court majority went on to say (id.):
This case, though concededly punitive, does not present a dramatic departure from the basic conditions of Conner's indeterminate sentence. Although Conner points to dicta in cases implying that solitary confinement automatically triggers due process protection, Wolff [v. McDonnell, 418 U.S. 539,] 571, n. 19 [94 S.Ct. 2963, 2982 n. 19, 41 L.Ed.2d 935 (1974)]; Baxter v. Palmigiano, 425 U.S. 308, 323 [96 S.Ct. 1551, 1560, 47 L.Ed.2d 810] (1976) (assuming without deciding that freedom from punitive segregation for "`serious misconduct'" implicates a liberty interest, holding only that the prisoner has no right to counsel) (citation omitted), this Court has not had the opportunity to address in an argued case the question whether disciplinary confinement of inmates itself implicates constitutional liberty interests. We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody.[4]
This Court, like the four dissenting Justices, sees Sandin as having taken a near-quantum-leap from the earlier cases on which it grounds itself. In this action the consequence *774 of taking Sandin at its word (as this Court is obliged to do) is to arm prison authorities, who have heretofore possessed uncircumscribed powers over the inmates within their custody only to a limited extent, with now-unrestrained power to punish those inmates by arbitrary reassignment to the meaningfully more restrictive environment of segregated confinement.[5] And it appears that can be done by a correctional official for no reason at alleven out of sheer vindictiveness because the absence of due process means nothing in terms of a Section 1983 claim unless the inmate's liberty interest has been infringed.
That result  which effectively treats wrongful commitment to segregation as an inherent consequence, a sort of assumed risk, of being in prison to begin with  strikes this Court as one more befitting a totalitarian regime than our own, and it is hard to credit that outcome as flowing from a principled Supreme Court decision. But this Court's duty is to take the Supreme Court at its word, and the dismissal of Leslie's claim appears to this Court to be the necessary outcome of a straightforward application (and not an extension) of Sandin. Having said that, this Court believes that appellate review of this opinion is desirable to test the accuracy of that view, and so it is to be hoped that the able counsel whom this Court has appointed to represent Leslie pro bono publico will be prepared to take that added step on his behalf. In the meantime, Doyle's motion is granted and this action is dismissed.[6]

SUPPLEMENT TO MEMORANDUM OPINION AND ORDER
Just after its issuance of yesterday's memorandum opinion and order ("Opinion II") dismissing this 42 U.S.C. § 1983 ("Section 1983") action by Joliet Correctional Center ("Joliet") inmate Keith Leslie ("Leslie") on the strength of the end-of-Term opinion in Sandin v. Conner, ___ U.S. ___, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), this Court had the opportunity to review the newly-delivered batch of last week's slip opinions from our Court of Appeals. As chance would have it, one of those opinions (Whitford v. Boglino, 63 F.3d 527 (7th Cir.1995) (per curiam))  has also construed and applied Sandin in connection with a Section 1983-based claim of an Illinois Department of Corrections inmate that his due process rights had been violated in a prison disciplinary proceeding. This supplement to Opinion II is issued in light of the Whitford opinion.
Whitford at 533-34 has read Sandin in the same way as this Court did in Opinion II. There is only one potential difference in the consequences of that reading: Whitford at 533-34 ordered a "remand for further fact-finding" because "the record is not sufficiently *775 developed for us to determine whether the conditions of Whitford's confinement were significantly altered when he was placed in segregation," while this Court's Opinion II dismissed Leslie's action without conducting such a hearing.
But that difference in treatment is appropriate because it flows from a critical difference between the two cases. Because the district judge in Whitford had of course ruled well before the Supreme Court decided Sandin (and Sandin itself has acknowledged that it represents a substantial departure from the prior trend of Supreme Court jurisprudence in the area of law with which it deals), by definition the Whitford district judge had no occasion to consider what Sandin has now defined as the controlling question. Hence the Court of Appeals in Whitford perforce had to deal with the record before it, a record that was empty on the question for which remand was necessary.
By contrast, this Court was fully able to "determine whether, in light of Sandin, [Leslie] possessed a liberty interest in freedom from placement in disciplinary segregation" (Whitford at 537 adapted to this case). As Opinion II reflects, this Court already had before it  essentially as a matter of judicial notice from court records in litigation dealing with inmates' claims  the necessary information as to the operative restrictions that are imposed on prisoners in each of the categories discussed and relied upon in Sandin: disciplinary segregation, administrative segregation, protective custody and general population. To be sure, if this Court had been writing on a clean slate in that respect (as it believed it was in its "Opinion I," 868 F.Supp. 1039, 1044 (N.D.Ill.1994)) it would have viewed those differences as implicating the deprivation of a liberty interest for an inmate who is placed in disciplinary segregation. But what this Court has now been required to do in this case is to write on the Sandin slate. And as Opinion II found, the Illinois situation that has been presented by Leslie cannot be distinguished in any principled way from the Hawaiian situation presented by inmate Conner and found constitutionally inadequate in Sandin.
Accordingly this supplement is written solely by way of amplification, not revision, of Opinion II in light of Whitford. This action remains dismissed.
NOTES
[1] Citations to the Opinion will take the form "Opinion at ____," referring to the page but not the volume number in F.Supp.
[2] That includes evidentiary submissions that plainly convert Leslie's pleading allegations into jury questions.
[3] As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).
[4] [Footnote by this Court] It is ironic that the Court's principal comparison is between prisoners in disciplinary segregation and those in administrative segregation (which is normally short-term while a charge or grievance is under investigation) or in protective custody, rather than a comparison with the vast majority of the inmates, who make up what is most commonly called the "general population" and who are not subjected to anything resembling the constraints imposed on prisoners in the segregation units. This Court has presided over extensive prison litigation, including more than a decade spent in adjudicating and monitoring a class action that held protective custody inmates' rights under the Equal Protection Clause to have been violated by the restrictive conditions to which they were subjected (the principal, but by no means the only, substantive opinion in that case was Williams v. Lane, 646 F.Supp. 1379 (N.D.Ill. 1986), aff'd, 851 F.2d 867 (7th Cir.1988)). Reports and extensive studies received by this Court in that and other cases reflect that in Illinois (and in other states whose correctional systems have been brought to this Court's attention) the differences between the lack of liberty afforded to segregated inmates and what is afforded to those in general population are very substantial indeed: 23 hours a day in one's cell rather than being able to spend many daylight hours utilizing prison facilities; far more limited opportunities for athletic activities and exercise; eating every meal alone in one's cell rather than going to the communal mess hall; no opportunity to attend such group activities as movies or to attend group religious services; the need to be personally attended by correctional officers for any limited movement that is permitted within the institution; and the list goes on. Given that substantial disparity in so many respects, the irony lies in the fact that the majority opinion makes its main (although not its only, see n. 5) comparison between disciplinary segregation and protective custody, a status in which the existence of such constraints is at best a necessary evil forced by the need to insulate such inmates from perceived threats to their safety that would be entailed if they were part of the general population. With all due deference to our highest judicial authority, this Court believes that the record to which the text quotation refers has spawned a false premiseand that false premise has in turn led to the false conclusion that disciplinary segregative status does not impose a meaningful impairment and therefore (sic) does not implicate the deprivation of a liberty interest. Withal, this Court is of course bound to accept and to follow that conclusion here.
[5] See n. 4. As that note indicates, the majority opinion in Sandin, ___ U.S. at ___, 115 S.Ct. at 2301 also went on to say:

Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.
That conclusion followed the Court's observation (id.) that the Hawaiian penal institution involved in that case imposed significant "lockdown" periods on general population inmates, who were therefore confined to their cells between 12 and 16 hours daily, depending on their classification (id. n. 8). But even under those conditions, which are not typical of most institutions, when the comparison is rendered more meaningful by extracting the inmates' night time sleeping hours (which are necessarily spent in their cells) out of each side of the inequality, a major disparity is seen to exist between the periods of waking-hours restrictions to which segregated prisoners are subjected (see n. 4) and the waking-hours limitations imposed on the general population.
[6] Doyle has also advanced a claim of qualified immunity as the basis for prevailing on summary judgment. But in that context this case poses an anomaly. At the time that Doyle acted (which is the relevant date for qualified immunity purposes), it had clearly been established that placing an inmate into segregative custody for no reason violated the inmate's constitutional rights. For example, even though the most recent case presenting a close parallel to this one (Stevens v. McHan, 3 F.3d 1204 (8th Cir.1993)) was handed down a few months after Doyle's action, it did not purport to announce new law, but relied on earlier case law; and Leslie's counsel have cited a number of authorities to the same effect. It has only been afterward, through the Sandin decision, that what had previously been thought to be clearly established has been ruled otherwise  and that sequence is not the stuff of which a qualified immunity defense may be fashioned.