**Anthony THOMAS, Plaintiff–Appellant,**

v.

**Anthony RAMOS, Margaret Thompson, Leona Gregory, David Essenpreis, and Yolande Williams, Defendants–Appellees.**

No. 96–1664.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1997.

Decided Nov. 3, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 3, 1998.

Before ESCHBACH, COFFEY, and DIANE P. WOOD, Circuit Judges.

COFFEY, Circuit Judge.

While Anthony Thomas was an inmate incarcerated in the Stateville Correctional Center in Illinois, serving a twelve year sentence for armed robbery, he received a disciplinary ticket for leaving his cell without permission and for threatening to strike a corrections officer on May 15, 1994. He was placed in segregation pending a hearing. After an initial hearing before a three-member panel of Stateville's Adjustment Committee and a subsequent continuance to obtain testimony from a witness, a second Committee panel issued a disciplinary sentence for Thomas's violations. After the Committee rendered a judgment on Thomas's infractions of prison rules, he continued to remain in segregation for approximately two months despite the fact that the Committee did not sentence him to any segregation time. Thereafter, Thomas brought a *pro se* complaint under 42 U.S.C. § 1983 against five employees of the correctional center alleging that he had been denied procedural due process and that his Eighth Amendment right to be free from cruel and unusual punishment was violated in that he was denied the opportunity to exercise outside of his cell during his period of confinement in the segregation unit. The district court granted the defendants' motion for summary judgment. Thomas appeals. We affirm.

## I. BACKGROUND

On May 15, 1994, several inmates were being escorted from their cells to a medical area of Stateville. Thomas was not one of the inmates being taken to the medical area and was instructed by correctional officers not to leave his cell. Despite these directions, Thomas decided to wander to another wing of the prison without permission. Shortly thereafter he was caught by several corrections officers. When defendant Dunlap and three other correctional officers approached Thomas and ordered him to return to his cell, Thomas refused and threatened to hit the officers. At this time, the prisoner was taken to the segregation unit by Lieutenant Bagley. Later that day Officer Dunlap wrote a disciplinary report charging Thomas with unauthorized movement, intimidation/ threats, disobeying an order, and insolence.

Under Stateville's regulations an inmate, when placed in segregation on temporary confinement status, is entitled to a disciplinary review hearing within eight days. Ill. Admin. Code tit. 20, §§ 504.40(a)-(b), 504.80(k)(3). A hearing is conducted by a three-member panel of Stateville's Adjustment Committee ("Committee"). The Committee either dismisses the charges, issues a penalty for the inmate's infractions, or places an inmate on further investigative status. Thomas appeared before the Committee on

May 20, 1994, and admitted to being out of his cell without permission, but denied threatening any officers. The Committee was chaired by one of the defendants, David Essenpreis, the case work supervisor in Thomas's segregation unit. Thomas requested a continuance, which was granted in order that he might obtain the testimony of Officer Bagley, whom he stated would corroborate his assertion that he had not made any threats against the officers. He was returned to segregation and placed on investigative status pending the reconvening of the Adjustment Committee. An inmate can be placed on investigative status for up to thirty days, Ill. Admin. Code tit. 20, §§ 504.50(c)(3), 504.40(a)(1)-(4).[1] Superintendent of Segregation Unit 1, Anthony Ramos, also a defendant in this action, stated in his deposition that if an inmate is placed on investigative status because he requested a continuance at his first hearing in order to obtain the testimony of witnesses then there is no time limit for how long he can be held in investigative status so long as the charges against him are resolved in a "timely manner."

The hearing was reconvened on May 31, 1994, before a newly comprised Committee consisting of defendants Margaret Thompson, Yolande Williams, and Leona Gregory. Thomas states that because he did not receive notice of this second hearing he was unable to attend and reiterate his version of the events of May 15, 1994. Officer Bagley, the witness Thomas requested, also was not present, but in his absence the Committee received and reviewed a report from an investigator stating that Bagley would confirm the accuracy of the disciplinary report that Thomas threatened to strike a correctional officer rather than corroborate Thomas's denial of any such threat. The summary of the proceedings from the May 20 meeting was read at the second Committee meeting and the panel found that Thomas had committed the offense of leaving his cell without permission and threatened to strike a correctional officer, as set forth in the disciplinary report on file. The Committee denied Thomas commissary privileges for two months and gave him two months demotion in prisoner status to C-grade. The Committee did not order any segregation confinement. The parties agree that Thomas was not released from segregation until at least July 21, 1994, some 51 days after the second Committee conference, in spite of the fact that the Committee's determination did not include an imposition of confinement in the segregation unit.[2]

On June 7, 1994, Thomas received a copy of the second Committee's summary, reflecting that the Committee had not recommended that he receive any further segregation punishment. It should be noted that, shortly after June 7, Thomas requested that his prison counselor arrange for his release from segregation forthwith. His counselor responded in writing on June 13, 1994, stating that the Committee was still investigating the charges against him and that thus, his detention status in segregation would continue as he was now classified as being held on investigative status. Thomas argues that as his disciplinary sentence did not include an order of further confinement in segregation it was improper for him to remain in segregation. Furthermore, Thomas asserts that defendant Essenpreis, the case work supervisor of the segregation unit, must have incorrectly informed the counselor that he was still on investigative status.

While Thomas was held in segregation, he was confined with another inmate in a cell that he described as approximately as wide as his outstretched arms and twice that long. Thomas claims that he remained locked in this cell 24 hours a day, except those few

[1]. The factors to be considered in deciding whether an inmate should be placed in temporary confinement or investigative status are:

1) The aggressiveness of the committed person;
2) The threat posed to the safety and security of the facility;
3) The need to restrict the committed person's access to general population to protect him from injury or to conduct the investigation; and/or
4) The seriousness of the offense.
§ 504.40(a)(1)-(4).

[2]. Thomas maintains that it was not until two days later on July 23, 1994, that he was actually released from the segregation unit and Ramos's prison log for Thomas reflects that he was released on July 22, 1994.

occasions when he was allowed to visit the doctor or speak with Ramos. Thomas asserts that the reason he visited the doctor was for treatment of mental and physical symptoms caused by the stress of confinement. Additionally, he claims that despite prison regulations which state that prisoners in segregation are to be given two hours of outside exercise each week, he was never allowed to exercise in the yard during the two month segregation period. Thomas stated in his affidavit that, "I never refused yard. I may not have been *able* to go to yard some days, as they often had yard at the same time I went to the doctor." (Appellant's Br., Affidavit of Anthony Thomas, App. at 18 para. 12 (emphasis in original).) On the other hand, the named defendants assert that, according to prison logs, Thomas was given the opportunity to exercise outside in the yard during his period in segregation on four separate occasions. The defendants further contend that Thomas accepted only one such opportunity and refused the three other opportunities.

Thomas also claims that during his period of segregation he had little contact with any other people [3] and was barred from all prison activities, including among others, educational and work programs. Thomas complains that when Ramos, the Superintendent of Segregation Unit 1, made his weekly rounds through the segregation unit and in particular on one occasion while in Ramos's office, he repeatedly requested that he be released from segregation and complained about his not receiving any outdoor exercise.

He states that Ramos replied that he lacked the authority to release any inmate from segregation and explained that only the warden and/or the Adjustment Committee had the authority to release an individual from segregation. Ramos further explained that the normal procedures for the release of an inmate from segregation are as follows.

After the Committee reaches a sentencing determination that does not include an imposition of time in segregation, the clerk of the Committee signs a transfer slip, which is then initialed by the supervisor of the Committee.[4] Then some member of the Committee, acting for and on behalf of the Committee, calls the segregation unit and informs them that a transfer slip is being sent. Ramos's deposition recites that after an officer of the segregation unit receives this phone call the inmate is released from segregation.

Ramos testified that he had no recollection of receiving any communication from the Adjustment Committee stating that Thomas was supposed to be released from segregation until July 22, 1994. The three members of the second Adjustment Committee, defendants Thompson, Williams, and Gregory, each stated that it was not their responsibility to provide the superintendent of the segregation cellhouse with their decision and that their responsibility was only to forward a summary of their Committee's action to the warden for his review.

Thomas filed a *pro se* complaint in the district court on July 11, 1994, while in segregation and thereafter retained counsel. His complaint named the five employees of Stateville referred to above and argued that his due process rights were violated by the named defendants in that they: (1) failed to give him advance written notice of the May 20 Adjustment Committee hearing;[5] (2) neither informed him, nor allowed him to attend the May 31 meeting, thereby preventing him from retelling his side of the story and calling witnesses; and (3) kept him in segregation after the determination of his sentence, despite the fact that the record reflects no imposition of confinement in segregation. Additionally, he alleged that Ramos violated his Eighth Amendment right in refusing to permit him to exercise outside of his cell

---

**3.** It is worth noting that as Thomas shared his cell with another inmate he obviously was able to interact and converse with this individual.

**4.** Thomas asserts that the Department of Correction rules provide that the chairperson of the Committee "[w]ill supervise the clerical staff." Institutional Directive 05.04.001K3, § II(A)(2).

Additionally, the Committee's clerical staff has the responsibility of, among other tasks, "[m]onitoring Segregation Placements for release dates and initiating unit assignment changes." Institutional Directive 05.04.001K3, § II(A)(3)(h).

**5.** Thomas does not raise this issue in this appeal.

while confined in the segregation unit from May 15 to at least July 21, 1994.

After reviewing the submissions of the parties, the trial court concluded that Thomas's detention in segregation did not implicate a liberty interest because it was not atypical of the treatment that a prisoner would expect to receive in prison and thus there can be no due process violation. The trial court further concluded that Ramos was entitled to qualified immunity from Thomas's Eighth Amendment claim because the right to outdoor exercise was not "clearly established" at the time Ramos allegedly denied him outdoor exercise privileges. The trial court granted summary judgment in favor of each of the defendants on all of Thomas's claims and he appeals. We affirm.

## II. DISCUSSION

A. *Atypical and Significant Deprivation of a Prisoner's Liberty Interest.*

■ The district court found that Thomas's confinement in segregation did not constitute the type of "atypical and significant" deprivation of a prisoner's liberty required under the standard established in *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995), and granted summary judgment for the defendants on Thomas's due process claims.

■ We review the district court's grant of summary judgment de novo, accepting all facts and inferences in the light most favorable to Thomas, the nonmoving party. *Oates v. Discovery Zone,* 116 F.3d 1161, 1165 (7th Cir.1997); *Williams v. Ramos,* 71 F.3d 1246, 1248 (7th Cir.1995). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Williams,* 71 F.3d at 1248. "Although we review all facts and inferences in the light most favorable to the nonmoving party, to avoid summary judgment that party must supply evidence sufficient to allow a jury to render a verdict in his favor." *Williams,* 71 F.3d at 1248 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)).

Thomas asserts that his due process rights were violated because he remained in disciplinary segregation after the Adjustment Committee determined his sentence and did not impose any period of segregation. However, "[t]he Due Process Clause does not necessarily protect prisoners against the imposition of disciplinary segregation." *Id.* at 1249. In *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976), the Supreme Court refused to hold that "any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause [because to do so] would subject to judicial review a very wide spectrum of discretionary actions that have traditionally been determined to be the business of prison administrators rather than of the federal courts."

One of the seminal cases on courts' jurisprudence over decisions made by prison authorities is *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *Johnson v. Phelan,* 69 F.3d 144, 145–46 (7th Cir.1995) ("*Wolfish* emphasized what is the animating theme of the Court's prison jurisprudence for the last 20 years: the requirement that judges respect hard choices made by prison administrators."), *cert. denied sub nom. Johnson v. Sheahan,* — U.S. ——, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996). In *Bell,* the Court stated that, "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878. "'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Id.* at 547–48, 99 S.Ct. at 1878–79 (quoting *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495

(1974)); *see Colon v. Schneider*, 899 F.2d 660, 667 (7th Cir.1990).

In discussing § 1983 actions we have previously stated that:

> When a plaintiff brings an action under § 1983 for procedural due process violations, he must show that the state deprived him of a constitutionally protected interest in "life, liberty, or property" without due process of law. A prisoner has no liberty interest in remaining in the general prison population. In fact, absent a constitutional, statutory, or regulatory bar, *"a prisoner may be transferred [from general population] for any reason, or for no reason at all."*

*Williams*, 71 F.3d at 1248–49 (citations omitted and quoting *Williams v. Faulkner*, 837 F.2d 304, 309 (7th Cir.1988) (emphasis added)).

■ In *Sandin*, the Supreme Court abandoned the approach that the mandatory nature of statutory and regulatory language creates a liberty interest protected by the Due Process Clause, and held that the actual focus of the liberty interest inquiry is the nature of the deprivation that a prisoner suffers. *Sandin*, 515 U.S. at 481–83, 115 S.Ct. at 2298–2300; *Williams*, 71 F.3d at 1249. A liberty interest exists when prison officials restrain the freedom of inmates in a manner that, "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S.Ct. at 2300 (citations omitted).

■ Thomas argues that the conditions under which he was confined in disciplinary segregation met the Sandin standard of constituting an "atypical and significant hardship." [6] Thomas asserted that while in segregation he was not permitted to take any classes, use the gym, work at an assignment, earn pay, have access to a "day room", or take programs offered to inmates in the general population and protective custody. The district court determined that Thomas lacked a liberty interest in light of the holdings in *Sandin* and *Williams*, where it was determined that inmates in disciplinary segregation under conditions similar to those Thomas faced did not implicate a liberty interest because the segregation conditions were not found to constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S.Ct. at 2300; *see Bryan v. Duckworth*, 88 F.3d 431, 433 (7th Cir.1996) (comparison between conditions of confinement of general population and those in segregation required); [7] *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir.1995) (remand to determine if conditions were significantly altered when placed in segregation). The district court did recognize that the conditions of confinement that Thomas was subjected to while in disciplinary segregation were harsher than those of inmates in the general population. On the other hand, the district court properly determined that even though Thomas was confined for a longer period than the plaintiffs in *Sandin* and *Williams*, the re-

---

**6.** Thomas additionally argues that his continued confinement in disciplinary segregation after the Committee had determined that his sentence did not mandate further time in segregation exceeded his "sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force...." He asserts that his confinement was so severe that it rose to the same level as that in *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (Due Process Clause itself confers a liberty interest when prisoner transferred involuntarily to mental hospital) and *Washington v. Harper*, 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990) (independent of any state regulation, inmate had liberty interest in being protected from the involuntary administration of psychotropic drugs). However, because Thomas's confinement in segregation obviously does not rise to the level of the involuntary transfer to

a mental hospital or administration of psychotropic drugs, it therefore does not exceed his sentence in an unexpected manner. Accordingly, he is not entitled to procedural due process unless his deprivation amounts to "atypical and significant hardship." *Sandin*, 515 U.S. at 484, 115 S.Ct. at 2300.

**7.** In *Bryan*, we stated:

> [I]f conditions in segregation were considerably harsher than those of the normal prison environment—a factual issue requiring for its resolution a comparison between the conditions of confinement of the general population and those in the segregation unit—then a year of it might count as a deprivation of liberty where a few days or even weeks might not.

*Bryan*, 88 F.3d at 433.

strictions imposed during his confinement were practically indistinguishable from those in *Sandin* and *Williams*.

In *Sandin,* an inmate, Conner, was sentenced to thirty days in disciplinary segregation by the adjustment committee for an offense that the prison authorities classified as "high misconduct." Nine months later, on administrative appeal, the high misconduct charge was found to be unsupported and was expunged from Conner's disciplinary record. However, while his administrative appeal was pending, Conners also brought a § 1983 action against prison officials alleging that his procedural due process rights were violated because he was not allowed to present a witness at his disciplinary hearing. *Sandin,* 515 U.S. at 475–76, 115 S.Ct. at 2295–96. The Supreme Court determined that although Conner's confinement in disciplinary segregation was punitive and subsequently expunged because it was unsupported, it did "not present a dramatic departure from the basic conditions of [his] indeterminate sentence [of thirty years to life]." *Id.* at 485, 115 S.Ct. at 2301. The Court also relied on the fact that the conditions of Conner's confinement in disciplinary segregation did not exceed those in totally discretionary and nonpunitive forms of segregation, such as those classified as administrative segregation and protective custody, nor did it differ from the conditions that even the general prison population experiences during periods of "lockdown" status. *Id.* at 486, 115 S.Ct. at 2301. In conclusion, the Court stated that the time in disciplinary segregation would not inevitably affect the duration of the inmate's sentence and that it "did not work a major disruption in his environment." *Id.*

In *Williams,* the plaintiff, as in the case before us, was a prisoner at Stateville who complained about being housed in disciplinary segregation and brought a § 1983 suit against Anthony Ramos. 71 F.3d at 1248.

> Williams argues that his confinement [for nineteen days] was significantly more onerous than life in the general population. He says that he was locked in a closed-front cell twenty-four hours a day, he was not allowed to participate in activities available to the general population or non-

segregated inmates housed in the same area, he was handcuffed whenever he left his cell, and he lacked much contact with other inmates or staff.

*Id.* at 1249. However, we determined that the conditions that he complained of did not greatly exceed what a prison inmate could expect from confinement generally, as " '[l]awful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a retraction justified by the consideration underlying our penal system.' " *Id.* (quoting *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974) (internal quotation omitted)). Like *Sandin,* the *Williams* decision was based in part on a finding that the length of the inmate's sentence was not affected and that there was no indication that the treatment the inmate received in disciplinary segregation was substantially different than that experienced by inmates confined under other forms of discretionary segregation. *Id.* at 1250. Our decision in *Williams* was also premised on our conclusion that Williams retained access to "at least some of the amenities of prison life," *id.* at 1250 n. 4, and that he had previously remained in segregation on a voluntary basis. *Id.* at 1249–50.

Thomas attempts to distinguish his case from *Sandin* and *Williams* by stating that his confinement was more severe in that he was housed in disciplinary segregation for approximately 70 days, as opposed to Williams's 19 days and 30 days in *Sandin.* Although Thomas was held in segregation longer than the inmates in these two cases it was obviously a relatively short period when one considers his 12 year prison sentence. Further, it is significant to note that from May 15 to May 31, 1994, Thomas was being held under temporary confinement and investigative status rather than disciplinary segregation and that during his confinement the entire segregation area was on lockdown for approximately thirty days. Both temporary confinement and investigative status have been determined to be discretionary segregation, and do not implicate a liberty interest. *Sandin,* 515 U.S. at 486, 115 S.Ct. at 2301. Thomas also asserts that there was no evidence that conditions in disciplinary segrega-

tion were similar to the discretionary forms of segregation that an inmate could be placed in without a hearing. We have previously stated that "there is no indication that persons in disciplinary segregation [at Stateville] receive treatment substantially different than that given persons in discretionary types of segregation." *Williams*, 71 F.3d at 1249 n. 5, 1250 (citations omitted).

Lastly, Thomas points out that, unlike the inmates in *Sandin* and *Williams*, he was held well beyond the period of thirty days that an inmate can be held under investigative status. Thomas has failed to demonstrate a deprivation of rights that rises to the level of an "atypical and significant hardship," or one that caused a "major disruption in his environment," even after reviewing the facts and inferences in the light most favorable to him. During this particular time frame, it is clear that the prison system at Stateville operated in a less than efficient manner in its release of Thomas from segregation once the Committee had determined not to impose any further period in the segregation unit as a penalty. As an example, certain of the prison employees were at best somewhat unclear of what the proper protocol for releasing an inmate from investigative segregation is once a penalty determination has been reached. In spite of Thomas's extended period in disciplinary segregation, we are convinced that it did not result in an atypical and significant deprivation because the conditions he experienced did not "greatly exceed[ ] what one could expect from prison life generally." *Williams*, 71 F.3d at 1249; *see Leslie v. Doyle*, 896 F.Supp. 771, 773–74 (N.D.Ill.1995) (granting summary judgment against prisoner who claimed he was placed in segregation for no reason at all). We agree with the district court's finding that the conditions in segregation that Thomas complained of were very similar to those in *Sandin* and *Williams*. Thus, Thomas's confinement did not implicate a liberty interest and there can be no due process

violations.[8] The defendants prevail as a matter of law and summary judgment was appropriate on each of Thomas's due process claims.

## B. *Eighth Amendment and Out of Cell Exercise*

In addition to raising his due process claims, Thomas also argues that his Eighth Amendment right to be free from cruel and unusual punishment was violated. He asserts that he was denied any outdoor exercise during the entire period he was confined in the disciplinary segregation unit.

Neither party disputes that inmates in segregation are entitled to two hours of exercise each week in the prison yard, unless the inmate is on yard restriction. Ramos stated that Thomas was not on yard restriction during the period of June and July 1994. According to the cellhouse log, outdoor yard privileges were unavailable to any inmate from May 31 until June 22, 1994, and from July 5, until July 11, 1994, when the entire cellhouse was on lockdown. Thus, exercise yard privileges were not available for any of the inmates in that cellhouse during those time frames. Ramos also stated that Thomas, in fact, received yard time on May 31, and refused yard time on June 29, July 13, and July 19. Ramos additionally stated that Thomas did not send him any communications or have any conversations with him regarding his alleged denial of yard privileges. However, Thomas refutes these contentions and on a review of summary judgment we are obligated to view the facts in the light most favorable to him. *Oates*, 116 F.3d at 1165.

In response to Thomas's Eighth Amendment claim, Ramos asserted that he is entitled to qualified immunity. The district court agreed and granted Ramos summary judgment on this claim as well. We conduct a *de novo* review of this issue. *Williams*, 71 F.3d at 1248.

---

**8.** Additionally, Thomas does not have a protectible liberty interest in his demotion to C-grade status and loss of commissary privileges. *Moore v. Pemberton*, 110 F.3d 22, 23 (7th Cir.1997) (two weeks denial of commissary privileges does not implicate liberty interest); *Madison v. Parker*, 104 F.3d 765, 768 (5th Cir.1997) (30 days denial of commissary does not create a liberty interest); *Whitford*, 63 F.3d at 533 n. 7 (demotion to C-grade for six months does not implicate federal due process rights).

■ "Public officials performing discretionary functions are entitled to qualified immunity from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gustafson v. Jones*, 117 F.3d 1015, 1020–21 (7th Cir.1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). This is an objective test, where we must inquire as a practical matter whether a reasonable official would have understood that his actions were unlawful at the time he acted. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Kerr v. Farrey*, 95 F.3d 472, 480 (7th Cir.1996).

■ Lack of exercise may rise to a constitutional violation in certain limited circumstances "where movement is denied and muscles are allowed to atrophy [and] the health of the individual is threatened." *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir.1985). However, while "[t]he Eighth Amendment forbids cruel and unusual punishments; it does not require the most intelligent, progressive, humane, or efficacious prison administration." *Anderson v. Romero*, 72 F.3d 518, 524 (7th Cir.1995). Additionally, it is important to remember that "[t]he Constitution does not mandate that prisons be comfortable, and a prison . . ., which houses persons convicted of serious crimes and who have demonstrated a propensity to violence or escape, cannot be free of discomfort." *Caldwell v. Miller*, 790 F.2d 589, 601 (7th Cir.1986) (internal citation omitted). "Conditions, alone or in combination, that do not, however, fall below the contemporary standards of decency, are not unconstitutional, and '[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 600 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Thomas relies on *Harris v. Fleming*, 839 F.2d 1232 (7th Cir.1988) and *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir.1988), for his assertion that prior to his confinement it was established that the denial of yard time (outdoor exercise) to inmates violated the Eighth Amendment. However, we do not read *Harris* and *Davenport* as support for Thomas's position because they do not specifically hold that an inmate's Eighth Amendment right is violated if he is denied *outdoor* exercise. In *Harris*, we found that summary judgment was appropriate where an inmate was denied yard time for four weeks because he could exercise in his cell for that short period of time. *Harris*, 839 F.2d at 1236. Likewise, we have also determined on a previous occasion that the Eighth Amendment was not violated when an inmate was confined to his cell twenty four hours a day and denied all outside and indoor exercise privileges for a month, followed by a six month period of confinement in a cell for twenty three hours a day with only one hour of daily indoor exercise. *Caldwell*, 790 F.2d at 600.

The court in *Davenport* noted that the class action involved was "limited to prisoners who served more than ninety consecutive days in segregation, and several of the class members spent more than a year there and one spent more than two and a half years there." *Davenport*, 844 F.2d at 1313. In contrast, Thomas was housed in segregation for approximately 70 consecutive days. In *Davenport* we stated that the district court did not commit clear error in concluding that the Eighth Amendment required that any prisoner who had been confined in segregation for 90 or more days be allowed at least five hours of exercise outside of his cell each week. *Id.* at 1314. Further, our analysis focused more on the aspect of isolation that single-celled prisoners in the class action experienced. *Id.* at 1313–14. As Thomas was confined to a cell with another inmate he was not subjected to the psychological stress of being denied all human contact as was discussed in *Davenport.*

Thomas's strongest support comes from our statement in *Anderson* that "[t]o deny a prisoner all opportunity for exercise outside his cell would, the cases suggest, violate the Eighth Amendment unless the prisoner posed an acute security risk if allowed out of his cell for even a short time." 72 F.3d at 527. However, we have more recently stated that "the principle of law governing [an

Eighth Amendment claim is that] ... [l]ack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996); *see Harris*, 839 F.2d at 1236; *French*, 777 F.2d at 1255. In *Antonelli*, the appellant alleged that his area was "about the size of a small house trailer with at least 37 other prisoners" and that inmates housed in that area were not permitted to recreate for periods of up to seven successive weeks. *Antonelli*, 81 F.3d at 1432. We found that the appellant had a viable Eighth Amendment claim because he did not have sufficient room for any type of recreation within his cell. Thomas, however, was not in this situation while he was confined in segregation because he would have been able to engage in exercise in his cell such as push-ups, sit-ups, jogging in place, and step-ups. *Davenport*, 844 F.2d at 1313; *Harris*, 839 F.2d at 1236. Additionally, he did obtain at least a minimal form of exercising on those occasions when he was given permission to leave his cell to visit the medical unit, regardless of whether he was shackled at the time. Granted the limited conditions under which he was able to exercise were less than ideal, nonetheless he did have the ability to exercise.

Further, although Thomas disputes that he was ever offered yard time, he does state that "I may not have been *able* to go to yard some days, as they often had yard at the same time I went to the doctor." (Appellant's Br., Affidavit of Anthony Thomas, App. at 18 para. 12 (emphasis in original).) Thomas chose to visit the medical unit to address his alleged mental and physical symptoms that he attributes to the stress of confinement.[9] It is clear that, if Thomas had not made this decision he would have had exercise in the yard available to him. Ramos stated in his deposition that if an inmate was at the medical unit during yard time it was likely that the recreation log would record his absence as a refusal of yard privileges. We have previously held on numerous occa-

sions that federal courts are most reluctant to interfere with the internal administration of state prisons because they are less qualified to do so than prison authorities. *Williams v. Lane*, 851 F.2d 867, 871 (7th Cir.1988) (citing *Block v. Rutherford*, 468 U.S. 576, 584–85, 104 S.Ct. 3227, 3231–32, 82 L.Ed.2d 438). In *Bell*, the Supreme Court stated:

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Bell*, 441 U.S. at 547–48, 99 S.Ct. at 1878 (quoting *Pell*, 417 U.S. at 827, 94 S.Ct. at 2806) (citations and footnotes omitted). Although prison authorities cannot indefinitely prevent an inmate from receiving exercise outside of their cell because of scheduling conflicts, the Eighth Amendment would not be violated where such a conflict occurred for only a few weeks. We refuse to get involved in scheduling conflicts that relate to the daily administration of prison in a case such as this where Thomas may have lost access to the yard due to doctor appointments during the time frame when the cellhouse was not on lockdown.

Additionally, there is also no evidence to contradict the defendants' contention that for approximately thirty days during the period of Thomas's confinement in segregation, the entire cellhouse was on lockdown status and all inmates were prevented from using the yard facilities. In light of this lockdown

---

**9.** There is nothing in the record that supports that Thomas received any counseling for his alleged mental symptoms during his visits to the medical unit or that such psychological counsel-

ing was even available to him. Thomas's affidavit merely states that his social worker and doctor told him to work on "stress reduction."

period and the forms of exercise available to Thomas in his cell and while visiting the doctor, albeit limited, we conclude that the segregation conditions did not violate "clearly established" statutory or constitutional rights during the period of Thomas's confinement. *Gustafson,* 117 F.3d at 1020–21. Thus, we are convinced that the district court's finding that Ramos was entitled to qualified immunity was correct and, thus its granting of summary judgment on the Eighth Amendment claim was proper.

### III.  CONCLUSION

We affirm the district court's grant of summary judgment in favor of defendants Ramos, Thompson, Gregory, Essenpreis, and Williams, on Thomas's due process claims, as well as the court's grant of summary judgment for Ramos on Thomas's Eighth Amendment claim.

AFFIRMED.

DIANE P. WOOD, Circuit Judge, concurring.

I concur in the majority's opinion, but I write separately to take exception to the court's handling of one aspect of Thomas's argument about yard time, which I fear could lead to confusion about the relevant legal standard in the future.

On page 764, the majority rejects Thomas's Eighth Amendment claim in part on the ground that he chose to visit the doctor rather than accept the opportunities to exercise in the yard. There is no evidence in the record, however, that supports the assumption that Thomas had any choice in the matter. Rather, his affidavit shows that he was unable, not unwilling, to go to the yard on days when he visited the medical unit. Viewing all facts and inferences in the light most favorable to Thomas, as we must, this indicates that Thomas had no discretion over the timing of his medical appointments and that the scheduled appointments conflicted with his assigned yard time. Thomas obviously could not be in two places at the same time. His decision to attend to his medical needs in no way implies that he was willingly foregoing his exercise time.

Notwithstanding the dilemma that he faced, I agree that Thomas failed to show that his constitutional rights were violated. This does not mean that prison administrators are entitled to require inmates to trade off one constitutional right (*e.g.,* medical care) against another (*e.g.,* hygiene, food, exercise). On this record, however, Thomas had access to some exercise opportunities, there is no evidence that his medical needs were severe enough to give rise to constitutional concerns, and his time in segregation did not implicate a protected liberty interest. For those reasons, I concur in the judgment of the court.