In the
United States Court of Appeals
For the Seventh Circuit

No. 98-4110

Alex Pearson,

Plaintiff-Appellee,

v.

Anthony Ramos,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 C 6591--Paul E. Plunkett, Judge.

Argued June 7, 2000--Decided January 22, 2001

Before Posner, Coffey, and Ripple, Circuit Judges.

Posner, Circuit Judge.  The plaintiff, a state prisoner, brought suit under 42 U.S.C. sec. 1983 against the superintendent of the disciplinary-segregation unit of the prison, seeking damages for harm that the plaintiff claimed to have suffered as a result of being denied access to the prison yard for exercise for an entire year. A jury awarded the plaintiff $15,000 in compensatory damages and $50,000 in punitive damages; the judge cut the punitive damages to $15,000 and entered judgment for the plaintiff, precipitating this appeal.

Prisoners in the segregation unit are confined to their cells, which are small (9 feet by 12 feet) and, because the cell contains a toilet and sink as well as a bed, cramped. They are allowed out only for trips to the law library or the health-care unit or to receive visitors or take a shower once a week, except that they are also allowed to use the yard for an hour a week, or five hours a week if they have been in segregation for at least 90 consecutive days. However, one of the authorized sanctions for serious infractions of prison rules is denial of yard privileges for 90 days. During a six-month period the plaintiff committed four such infractions and was punished for each one with a 90-day denial of yard privileges, the "sentences" to run consecutively ("stacked," as the parties

call it). As a result, he was denied access to the yard for a year. He contends that this denial was a cruel and unusual punishment.

The defendant claims entitlement to immunity, as well as challenging the judgment on the merits. The plaintiff argues that since the defendant could have appealed from the denial of his immunity claim before the trial and judgment, it is too late for him to appeal now. That is wrong. Even when there is a right of interlocutory appeal, a party can wait till the case is over and then appeal, bringing before us all nonmoot interlocutory rulings adverse to him. Jays Foods, L.L.C. v. Chemical & Allied Product Workers Union, Local 20, 208 F.3d 610, 614 (7th Cir. 2000); Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 608 (7th Cir. 1993); Chambers v. Ohio Dept. of Human Services, 145 F.3d 793, 796-97 (6th Cir. 1998). This principle is as applicable to rulings on immunity as to any other interlocutory rulings, SEC v. Quinn, 997 F.2d 287 (7th Cir. 1993); Goff v. Bise, 173 F.3d 1068, 1072 (8th Cir. 1999); Ernst v. Child & Youth Services of Chester County, 108 F.3d 486, 492-93 (3d Cir. 1997); Kiser v. Garrett, 67 F.3d 1166, 1169 (5th Cir. 1995); but see Price v. Kramer, 200 F.3d 1237, 1243-44 (9th Cir. 2000), although as we explained in Quinn the defendant who postpones his immunity appeal till after trial forfeits one of the rights that immunity confers, the right not to be tried at all. Certainly from our standpoint, however, it is preferable for a party to file a single appeal at the end of the case rather than a series of interlocutory appeals.

In order that legal doctrine may continue to evolve in common law fashion, the Supreme Court has instructed us to decide the merits of an appeal even if there is a good immunity defense, since a decision on whether the defendant is entitled to immunity requires freezing the law as of the date he acted. Wilson v. Layne, 526 U.S. 603, 609 (1999); County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5 (1998); Siegert v. Gilley, 500 U.S. 226, 232-33 (1991). Whether this rule is absolute may be doubted, for reasons explained in Kalka v. Hawk, 215 F.3d 90, 94-98 (D.C. Cir. 2000), and Horne v. Coughlin, 191 F.3d 244 (2d Cir. 1999), but the reasons are inapplicable here. The issue on the merits is important and should be resolved without further delay. We shall reverse the judgment on the merits, and so moot the issue of immunity. But we cannot forbear to express our surprise at the action of the district court in rejecting the defense of immunity. Since no one could believe that a single 90-day denial of yard privileges would be a cruel and unusual punishment for a serious

violation of prison disciplinary rules, the dispositive issue in this case is whether the stacking of such sanctions to the point of depriving a prisoner of an entire year of yard access is cruel and unusual punishment; and as there was no case law when the defendant acted indicating that it is and no tenable argument then or now that stacking so clearly violated the Eighth Amendment that an official in the defendant's position would have had to know that it did, even without any guidance from case law, it is obvious that the immunity defense should have been sustained. Wilson v. Layne, supra, 526 U.S. at 614-15; Anderson v. Creighton, 483 U.S. 635, 639-41 (1987); Burgess v. Lowery, 201 F.3d 942, 944-45 (7th Cir. 2000); Anderson v. Romero, 72 F.3d 518, 526-27 (7th Cir. 1995); Eberhardt v. O'Malley, 17 F.3d 1023, 1028 (7th Cir. 1994); McBride v. Village of Michiana, 100 F.3d 457, 460 (6th Cir. 1996); Buonocore v. Harris, 65 F.3d 347, 356-57 (4th Cir. 1995).

On to the merits. In Davenport v. DeRobertis, 844 F.2d 1310 (7th Cir. 1988), we upheld, as not clearly erroneous, a judge's finding that the Eighth Amendment entitled prisoners held in segregation for 90 days or more to five hours of out-of-cell exercise a week. See also Anderson v. Romero, supra, 72 F.3d at 527-28; Jamison-Bey v. Thieret, 867 F.2d 1046 (7th Cir. 1989); Allen v. Sakai, 40 F.3d 1001, 1004 (9th Cir. 1994). Confinement in segregation is an approximation to solitary confinement, and evidence that this court in Davenport found convincing indicates that long stretches of such confinement can have serious adverse effects on prisoners' psychological well-being. When unrelieved by opportunities for out-of-cell exercise, such confinement could reasonably be described as cruel and, by reference to the current norms of American prisons, unusual. Tighter limits on the right to exercise have been upheld when the period of restriction was shorter than 90 days. E.g., Thomas v. Ramos, 130 F.3d 754, 762-64 (7th Cir. 1997); Caldwell v. Miller, 790 F.2d 589, 600-01 (7th Cir. 1986).

The 90-day threshold for considering a denial of out-of-cell exercise opportunities a possible violation of the cruel and unusual punishments clause is of course arbitrary. But issues of immunity to one side, prison authorities are entitled to some guidance from the courts with respect to the meaning of the vague generalities of the Constitution. We think it a reasonable rule that a denial of yard privileges for no more than 90 days at a stretch is not cruel and unusual punishment. Thomas v. Ramos, supra, 130 F.3d at 763-64; cf. Henderson v. Lane, 979 F.2d 466, 469 (7th Cir. 1992) (per curiam). At least

in general; for the cruel and unusual punishments clause has a relative as well as an absolute component. Certain forms of punishment are considered cruel and unusual without regard to the conduct for which they are imposed. Lousiana ex rel. Francis v. Resweber, 329 U.S. 459, 464 (1947); In re Kemmler, 136 U.S. 436, 446-47 (1890); James v. Milwaukee County, 956 F.2d 696, 698-99 (7th Cir. 1992). Even a mass murderer is not to be executed by being drawn and quartered. In addition, however, forms of punishment that are permitted for serious crimes may violate the clause if imposed for trivial ones. Solem v. Helm, 463 U.S. 277 (1983); Rice v. Cooper, 148 F.3d 747, 752 (7th Cir. 1998); Leslie v. Doyle, 125 F.3d 1132, 1135 (7th Cir. 1997); United States v. Saccoccia, 58 F.3d 754, 787-89 (1st Cir. 1995). That is, there is a norm of proportionality (though attenuated in recent decisions of the Supreme Court, notably Harmelin v. Michigan, 501 U.S. 957, 990-94 (1991), we continue to recognize it, Henry v. Page, 223 F.3d 477, 482 (7th Cir. 2000)), and we can imagine the norm's being violated by imposing a 90-day denial of yard privileges for some utterly trivial infraction of the prison's disciplinary rules, though we cannot find any case to support such a suggestion.

The infractions here were not trivial, however. In the first one, the plaintiff and another inmate attacked and beat a guard, injuring him seriously enough to require his hospitalization. In the second, the plaintiff set fire to blankets, coats, and cardboard boxes, producing so much smoke that prisoners with respiratory problems had to be evacuated. Next, the plaintiff spat in the face of a guard who was trying to restrain him after the plaintiff had assaulted another guard. Last, he threw a broom and a bottle of unspecified "bodily fluids" at a medical technician, and the fluids got on the victim's face. We do not understand the plaintiff to be arguing that for each such infraction a 90-day withdrawal of yard privileges would be excessive punishment, even in conjunction with the other sanctions imposed on the plaintiff each time, such as loss of good time. Rather, he asks us to treat this case as if a 360-day denial of yard privileges had been decreed for a course of misconduct embracing the four infractions.

Suppose we do that; we still do not think that, in the circumstances, it could reasonably be found that the punishment was cruel and unusual. All four infractions occurred when the plaintiff was outside his cell. All occurred within the short space of six months. They marked the plaintiff as violent and incorrigible. To allow him to exercise in the yard would have given him

additional opportunities to attack prison staff and set fires. Preventing access to the yard was a reasonable method of protecting the staff and the other prisoners from his violent propensities. Any objection to the punishment based on considerations of proportionality thus dissolves and leaves for consideration only whether the denial of yard privileges for a year does so much harm to a prisoner that it is intolerable to the sensibilities of a civilized society no matter what the circumstances. The answer is no, and is supported by case law, Martin v. Tyson, 845 F.2d 1451, 1456 (7th Cir. 1988) (per curiam); Bass v. Perrin, 170 F.3d 1312, 1316-17 (11th Cir. 1999); LeMaire v. Maass, 12 F.3d 1444, 1457-58 (9th Cir. 1993), which casts still further doubt on the district court's denial of qualified immunity.

To confine in "solitary" a prisoner who behaves like a wild beast whenever he is let out of his cell is the least cruel measure that occurs to us for dealing with such a person. What else should the prison have done? No answer is suggested by the plaintiff's lawyer or by the district court, and we shall merely register our astonishment at the judge's remark that none of the plaintiff's infractions involved "serious harm to others." The first inflicted serious harm, and the second (the arson) and the fourth (the assault with the bottle of bodily fluids) created a serious danger of inflicting serious harm.

It is telling that no credible evidence was presented of any physical or psychological harm to the plaintiff as a result of his protracted confinement in the segregation unit, although he was permitted to perjure himself by testifying that he lost weight during the year that he was denied yard privileges, when unchallenged prison records showed that he did not lose any weight, and by testifying that his teeth fell out as a consequence of his lack of out-of-cell exercise, when in fact he lost only one tooth and that at the outset of the period. Even permitting him to testify about his teeth violated the rules of evidence. A nonexpert is not permitted to give expert testimony. Fed. R. Evid. 702. Wholly lacking in medical knowledge as he was, the plaintiff was incompetent to testify on the causal relation if any between exercise and healthy gums. See Pedraza v. Jones, 71 F.3d 194, 197 (5th Cir. 1995); cf. Fedro v. Reno, 21 F.3d 1391, 1396-97 (7th Cir. 1994); In re TMI Litigation, 193 F.3d 613, 680 (3d Cir. 1999); Summers v. Missouri Pacific R.R. System, 132 F.3d 599, 604 (10th Cir. 1997). There was no expert testimony concerning the effects of the denial of yard privileges on the plaintiff's physical or mental health, though an expert was permitted to

answer a hypothetical question concerning the possible effect of protracted solitary confinement on prisoners in general.

In any event, it is wrong to treat stacked sanctions as a single sanction. To do so produces the ridiculous consequence of enabling a prisoner, simply by recidivating, to generate a colorable Eighth Amendment claim. Suppose that the sanction for an infraction of the prison's disciplinary rules were only a single week's withdrawal of yard privileges; on the plaintiff's theory, if he committed 52 infractions, he could complain that a year's denial of yard privileges violated his rights under the Eighth Amendment. "If [the defendant] has subjected himself to a severe penalty, it is simply because he has committed a great many of such offenses. It would scarcely be competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary, on the ground that he had committed so many burglaries that, if punishment for each were inflicted upon him, he might be kept in prison for life. The mere fact that cumulative punishments may be imposed for distinct offenses in the same prosecution is not material upon this question." State v. Four Jugs of Intoxicating Liquor, 2 Atl. 586, 593 (Vt. 1886), quoted in O'Neil v. Vermont, 144 U.S. 323, 331 (1892) (emphasis in original); see also Hawkins v. Hargett, 200 F.3d 1279, 1285 n. 5 (10th Cir. 1999); United States v. Aiello, 864 F.2d 257, 265 (2d Cir. 1988). Every disciplinary sanction, like every sentence, must be treated separately, not cumulatively, for purposes of determining whether it is cruel and unusual. Any other rule would permit a defendant, at the end of a long criminal career, to ask a court to tack together all his criminal punishments and decide whether, had they been a single punishment, they (it) would have been cruel and unusual. Suppose a defendant sentenced to death had previously served 20 years in prison for an unrelated crime. Would it be open to him to argue that imprisoning a person for 20 years and then executing him constitutes cruel and unusual punishment? We think not.

Incidentally, we are at a loss to understand what the district judge was thinking when he upheld an award of punitive damages against this defendant, even if we are wrong in thinking that there was no violation of the plaintiff's rights. There is no suggestion that the defendant acted with any malice toward the plaintiff. He imposed a sanction authorized by state law; and though he imposed it repeatedly, not only was this stacking also authorized, but he had no reason to believe that he was violating the Eighth Amendment. The criteria for imposing punitive damages in a civil

rights case, on which see Smith v. Wade, 461 U.S. 30, 56 (1983); Kolstad v. American Dental Ass'n, 527 U.S. 526, 535-36 (1999); Kyle v. Patterson, 196 F.3d 695, 697-98 (7th Cir. 1999); Merriweather v. Family Dollar Stores of Indiana, Inc., 103 F.3d 576, 581-82 (7th Cir. 1996); Iacobucci v. Boulter, 193 F.3d 14, 25-26 (1st Cir. 1999), were not remotely satisfied here. Indeed, there isn't enough evidence of the state of mind of the defendant to justify a finding of liability, even if the plaintiff's confinement was a violation of the Eighth Amendment, as we have held it is not. For there is no evidence that Superintendent Ramos was actually aware of any risk to the plaintiff's physical or psychological well-being. See Wilson v. Seiter, supra, 501 U.S. at 303; In re Long Term Administrative Segregration of Inmates Designated as Five Percenters, 174 F.3d 464, 471-72 (4th Cir. 1999); Bass v. Perrin, supra, 170 F.3d at 1317.

The judgment of the district court is reversed with instructions to enter judgment for the defendant.

Reversed.

RIPPLE, Circuit Judge, concurring in the judgment. The Eighth Amendment to the Constitution of the United States prohibits the infliction of cruel and unusual punishment. The question we must resolve in this case is whether Mr. Ramos violated this constitutional provision when he ordered Mr. Pearson to be confined in segregation without an opportunity to exercise outside his cell for a long period of time.

1.

Our understanding of the issue before us--and of the import of the majority's conclusion--will best be understood if the facts surrounding Mr. Pearson's extended deprivation are placed in the broader factual context of the case.

Mr. Pearson is serving a 45-year sentence in Stateville Correctional Center ("Stateville") for murder. For disciplinary reasons, Mr. Pearson was placed in segregation in "I House"; Mr. Ramos is the Unit Manager (or cell block supervisor) for I House. Inmates in segregation usually are allowed at least one hour of outdoor recreation ("yard") privileges per week. After an inmate has been in

segregation for 90 days or more, he is allowed five hours of yard time per week. However, under a Stateville directive, called "Administrative Directive 05.03.140" or "Department Rule 504," the warden or his designee (here, Mr. Ramos) can limit or deny yard privileges to inmates who have been found guilty of certain offenses or for other disciplinary reasons. According to the policy, yard privileges may be restricted for up to 90 days for an inmate's first offense and, thereafter, allows for successive restrictions to be imposed for subsequent offenses. When the warden orders a lockdown, no prisoners are given yard time. Inmates are not prohibited from exercising in their cells (to the extent that exercise in the cells is possible), and they are given an instruction pamphlet on how to do so.

Over the period beginning in November 1993, and ending in May 1994, the prison's adjustment committee found Mr. Pearson guilty of a series of infractions./1 For each infraction, Mr. Ramos restricted Mr. Pearson's yard privileges for 90 days, and, except for a one-week gap,/2 the restrictions ran consecutively. See R.47 at 3-4. Except for this week-long gap in March 1993, however, Mr. Pearson was denied yard privileges at all times between December 15, 1993, and December 23, 1994.

This loss of yard privileges imposed by Mr. Ramos was separate from, and in addition to, that imposed by the prison adjustment committee. The prison adjustment committee's disciplinary measures for Mr. Pearson's infractions included the revocation of good time credits, the imposition of additional time in segregation, the demotion of Mr. Pearson to "C grade" for a period of time, and the denial of commissary privileges for a period of time.

During this year of yard restriction, Mr. Pearson's daily life was, as a practical matter,/3 limited to his cell./4 In October 1994, Mr. Pearson submitted a grievance in which he protested the lack of yard privileges and claimed that, as a result, he was suffering "psychological harm and stress, etc." See R.47 at 5 (internal quotation marks and citations omitted). At trial, Mr. Pearson testified that he suffered from appetite and weight loss and that he was not "as big" as before. See id. (internal quotation marks and citations omitted).

2.

The panel majority holds that, as a matter of law, the prolonged confinement of Mr. Pearson in this manner does not violate the Eighth Amendment. It arrives at this conclusion by

characterizing Mr. Pearson's continuous confinement under these circumstances as simply the unfortunate accumulation of consecutive sentences on Mr. Pearson's part. Indeed, making no distinction between sentences to confinement by a court for criminal charges and the administrative measures at issue here, the majority emphasizes that, when multiple offenses are committed, the Cruel and Unusual Punishments Clause is not violated when separate punishments are imposed for each violation; the concomitant enhancement in the total sanction can be viewed as the product of the offender's recalcitrant behavior. See O'Neil v. Vermont, 144 U.S. 323, 331 (1892).

This general principle of criminal law is unexceptional. With respect to criminal sentences imposed by a court, it is well-established in our jurisprudence. The question remains, however, whether it is appropriate or helpful to the resolution of the situation before us today. The problem before us does not require that we simply measure against Eighth Amendment standards the length of a prison sentence. Rather, this case concerns conditions of confinement. We must determine whether a prison official can execute administrative penalties in such a way as to deprive the prisoner of an opportunity for exercise outside his cell for a prolonged period of time, in this case, almost a year.

3.

Relying on the methodology articulated by the Supreme Court in a number of decisions,/5 the panel majority immediately proceeds to the merits of the appeal rather than examine in the first instance the possibility that there is a valid qualified immunity defense. The panel majority then determines that, contrary to a jury verdict rendered under instructions about which neither party takes issue, Mr. Pearson was not treated in a manner that violates the Eighth Amendment.

The basic principles governing a conditions of confinement case under the Eighth Amendment are well-settled. The Supreme Court has said that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994). This test has an objective and a subjective component. To satisfy the objective component, the inmate must establish that the alleged deprivation is "objectively, sufficiently serious." Farmer, 511 U.S. at 834 (internal quotation marks and citations omitted). To be

sufficiently serious, the official's action or omission must result in "the denial of the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834 (internal quotation marks and citations omitted). This circuit has said that only "extreme deprivations" make out a "conditions-of-confinement claim." Henderson v. Sheahan, 196 F.3d 839, 845 (7th Cir. 2000) (internal quotation marks and citations omitted). To satisfy the subjective component, the inmate must demonstrate that the prison official knew of a substantial risk of serious injury. The official must be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists. See Farmer, 511 U.S. at 842; Henderson, 196 F.3d at 845.

There can be no doubt--indeed it is common ground between the parties and admitted by the panel majority--that a failure to afford prisoners an adequate opportunity to exercise can state an Eighth Amendment claim. See Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th Cir. 1996). Although Mr. Ramos is correct that cases like Davenport v. DeRobertis, 844 F.2d 1310 (7th Cir. 1988), do not set out the constitutional minimum for exercise time, the principles that can be drawn from this circuit's case law manifest a clear aversion to denying prisoners outside exercise time for extended periods absent an acute need to do so. Davenport and Harris v. Fleming, 839 F.2d 1232 (7th Cir. 1988), strongly suggest that a total restriction is acceptable only when that restriction is short term. See Davenport, 844 F.2d at 1315 ("[W]e are impressed by the number of decisions that hold or suggest that a failure to provide inmates (confined for more than a very short period . . .) with the opportunity for at least five hours a week of exercise outside the cell raises serious constitutional questions."); Harris, 839 F.2d at 1236 (emphasizing that the restriction was only four weeks). One year is not short term. No doubt, there are situations in which considerations of prison security require such a drastic curtailment of an inmate's movement. There are indeed, as the panel majority notes,/6 extreme cases in which such measures have been tolerated because of particularly acute security situations. For instance, the Ninth Circuit's decision in LeMaire stands for the proposition that prison officials may impose complete yard restrictions--even for an extended period of time--when there is an acute security need to do so. 12 F.3d at 1457-58. This circuit as well has acknowledged this exception. See Anderson v. Romero, 72 F.3d 518, 527 (7th Cir. 1995) ("To deny a prisoner all opportunity for exercise outside of his cell would, the cases suggest, violate the Eighth Amendment unless the prisoner

posed an acute security risk if allowed out of his cell for even a short time.").

4.

The case before us presents a close and difficult one for the application of these principles. Under our existing case law, which the panel majority does not purport to overrule, a total restriction on exercise of this duration would not be sustainable absent exigent circumstances. Therefore, the action of Mr. Ramos in imposing such a restriction depends entirely on whether there is an adequate basis in prison security concerns. In this regard, there is certainly evidence in the record that Mr. Pearson was a dangerous offender. He received three of the four restriction periods because of assaults he perpetrated on prison staff. On the other hand, it is clear that Mr. Pearson did not pose the serious threat that the "beast" of an inmate in LeMaire posed. 12 F.3d at 1464 (Noonan, J., dissenting).

The existence of viable alternatives to out-of-cell exercise must also be taken into consideration. As Mr. Ramos argues, Mr. Pearson was not cut off from all human contact. But it seems less than certain that he could exercise in any meaningful way in his cell. Notably, the district court stated that Mr. Pearson's cell was "too small for meaningful exercise." R.88 at 2.

Perhaps the most difficult question to resolve is whether Mr. Ramos acted with a sufficiently culpable state of mind for him to be liable. The record shows that Mr. Ramos imposed these successive restrictions on Mr. Pearson in response to his disciplinary infractions and the safety threat Mr. Pearson had demonstrated. Thus, Mr. Ramos' motivation for these restrictions had some penological purpose. Moreover, if it is true that Mr. Ramos has seen other prisoners exercising in their cells, it might be too much to say that he consciously disregarded a substantial risk of harm.

Given the difficult factual assessments that must be made in this case, including the issue of intent, the district court took the view that whether the confinement of a prisoner without the opportunity for exercise outside his cell for so long a period constituted cruel and unusual punishment was an issue for the jury. It therefore submitted the issue to the jury under instructions that are not contested here. The jury found that such prison conditions constituted cruel and unusual punishment. The district court, perceiving no error in the jury verdict, let it stand.

My colleagues now ignore that jury verdict and hold that, as a matter of law, the confinement of Mr. Pearson under these conditions did not constitute cruel and unusual punishment. It is difficult to see where the majority finds the legal error that justifies such a rigid approach. As I have noted earlier, it certainly cannot be in the district court's permitting the jury to assess the punishment in the aggregate. This is not a simple sentencing matter, but a prison conditions matter. The basic question is not whether Mr. Pearson can be deprived of a certain number of days of yard time, but whether he can be deprived of those days in a continuous manner. Nor can the majority's approach be justified on the ground that the two-step process outlined by the Supreme Court for the assessment of qualified immunity claims requires such action. Surely, the court complies with the Supreme Court directive by holding that the record developed at trial creates a genuine issue of triable fact as to whether Mr. Ramos' actions constituted cruel and unusual punishment.

At bottom, the majority appears simply to disagree with the jury as to whether this incarceration offends the sensibilities of a civilized society. Central to its analysis appears to be the belief that a "beast," slip op. at 6, deserves beastly treatment. Moreover, its manner of expressing that disagreement places in doubt the circumstances under which it would be appropriate, in its view, to submit an Eighth Amendment case to the jury. In the past, we have recognized the role of the jury in assessing prison condition cases. See Walker v. Shanksky, 28 F.3d 666, 673 (7th Cir. 1994). Today's opinion marks a decided mistrust in that institution and a concomitant endorsement of the view that judges are endowed with a superior view of what our society ought to tolerate in the treatment of prisoners.

5.

If all the facts of this case are construed in favor of Mr. Pearson, there certainly is sufficient evidence to permit a jury to find a violation of the Eighth Amendment. We nevertheless must determine whether Mr. Ramos was entitled to qualified immunity at the time of Mr. Pearson's prolonged incarceration. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The law must be clear when the defendant

official acted. See, e.g., Rakovich v. Wade, 850 F.2d 1180, 1208-09 (7th Cir. 1988) (en banc).

Even if we construe all facts in favor of Mr. Pearson, Mr. Ramos is correct in his argument that, in 1994, at the time he acted, it was not entirely clear that the confinement he imposed violated the Eighth Amendment. Nor was it clear at the time that "stacked" administrative punishments imposed for subsequent infractions were to be analyzed cumulatively. Indeed, my colleagues take the contrary position today. Accordingly, I believe that Mr. Ramos is entitled to qualified immunity and, on that basis, join in reversing the judgment of the district court.

/1 These infractions were: (1) seriously assaulting a prison official in November 1993; (2) setting fires outside his cell in March 1994; (3) assaulting a prison official in April 1994; and (4) seriously assaulting yet another prison official in May 1994.

/2 There was a one-week gap between the 90-day periods for his first and second offenses. The first 90-day period ended on March 15, 1994, and the second period began on March 23, 1994.

/3 Over the course of the year, Mr. Pearson left his cell at least four times a month and more often seven or eight times a month, either to take showers (generally once a week), to visit family members, to go to the law library, or to visit the health center. Whenever he left his cell, Mr. Pearson's legs were shackled and his arms restrained by chains. "Any walking he did outside his cell would have been little more than a shuffle." R.88 at 2. During the first 90-day period, Mr. Pearson left his cell at least 23 times for a total of 31.7 hours. (Although prison records show that Mr. Pearson was given 3 hours of yard time on February 14, 1994, Mr. Pearson denies that this occurred.) During the second 90-day period, Mr. Pearson left his cell at least 20 times for a total of about 33 hours away from it. The prison was under a lockdown for 33 days during this period. During the third 90-day period, Mr. Pearson left his cell at least 16 times for a total of 32.5 hours. The prison was under a lockdown for 28 days during this period. Finally, during the fourth 90-day period, Mr. Pearson left his cell 13 times for a total of 24 hours. The prison was under a lockdown for 42 days during this period.

/4 Mr. Pearson apparently transferred cells a few times over the course of the year. It appears that each of Mr. Pearson's cells would have

contained a sink, a bed, and a toilet. They also would have had a window, which could be cracked open. In its summary judgment order, the district court reports that his cell contained an open area approximately 10'2" long and between 3'8" and 4'8" wide. See R.47 at 4. Later, in the district court's order denying the motion for judgment as a matter of law, the court stated that the open area in Mr. Pearson's cell was "two by five feet." R.88 at 2.

/5 See Wilson v. Lane, 526 U.S. 603, 609 (1999); County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998); Siegent v. Gilley, 500 U.S. 226, 232-33 (1991).

/6 See, e.g., Bass v. Perrin, 170 F.3d 1312, 1316-17 (11th Cir. 1999); LeMaire v. Maass, 12 F.3d 1444, 1457-58 (9th Cir. 1993).