NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 5, 2013[*]
Decided April 8, 2013

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

DIANE P. WOOD, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 11-3480

| | |
|---|---|
| MARK A. WINGER, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Central District of Illinois. |
| | |
| *v.* | No. 06-1226 |
| | |
| GUY D. PIERCE, et al., | Joe Billy McDade, |
| *Defendants-Appellees.* | *Judge.* |

## O R D E R

For a year Mark Winger was prevented from exercising outside his prison cell, except on one occasion for an hour. This confinement, Winger claims, violated the Eighth Amendment. Previously we reinstated Winger's suit under 42 U.S.C. § 1983, which the district court had dismissed at screening on the mistaken view that the complaint did not state a claim. *See Winger v. Pierce*, 325 F. App'x 435 (7th Cir. 2009). On remand the court granted summary judgment for the defendants, all prison officials. Winger again appeals.

---

[*]This appeal is successive to case no. 07-3021 and is being decided by the same panel under Operating Procedure 6(b). After examining the briefs and the record, we have concluded that oral argument is unnecessary. *See* Fed. R. App. P. 34(a)(2)(C).

Winger was sentenced to life imprisonment in 2002 for the murders of his wife and a driver for an airport shuttle service. Winger had lured the driver to their home and then told police he shot the man in self defense after he broke into the house and killed Winger's wife with a hammer. At the time Winger also was having an affair, and the woman became the prosecution's star witness after Winger confessed the murders to her. *See* Linda Rockey, *Domestic Disturbance*, CHI. TRIB., Jan. 20, 2002, (Magazine) at 10. In 2005 while he was at Pontiac Correctional Center, Winger solicited another inmate to arrange the woman's kidnapping and murder. Winger envisioned that his murder convictions would be overturned if the woman was forced to make a video recanting her trial testimony and then died in an apparent suicide. Prison staff learned about this plot in June and moved Winger to administrative segregation while they investigated. A month later, on July 21, an adjustment committee found him guilty of several infractions arising from his plan. The committee recommended, in addition to other sanctions, that Winger serve a year in disciplinary segregation without access to the recreation yard. In early August the warden approved that recommendation.

Winger promptly filed a grievance, which for prisoners in Illinois is the correct procedure to challenge a disciplinary decision. *See* ILL. ADMIN. CODE tit. 20, § 504.810(a). That lengthy grievance, dated August 16, 2005, raises a number of substantive and procedural objections to the finding of guilt. But Winger's objection to the recreation restriction concerned only its length; he insisted that Illinois law, *see id.* § 504.670, limits restrictions on recreation privileges to 90 days. He did not assert that the cells in disciplinary segregation are too small for physical exercise. Neither did he assert that his confinement without yard privileges was causing physical or emotional harm. In October the warden accepted the grievance officer's recommendation to deny Winger's submission.

He then appealed to the Administrative Review Board. In his written submission dated October 14, Winger reasserted his substantive and procedural challenges to the finding of guilt, but this time he made no specific mention about the recreation restriction and he did not assert that his confinement was making exercise impossible or causing physical or psychological harm. On December 14 the ARB's chairperson, Melody Ford, interviewed Winger by video link and allowed him to elaborate on his written submission. Her written summary of that interview (no recording was made) recounts that Winger wanted compensation because his banishment from the recreation yard had exceeded 90 days. According to the chairperson, Winger also had asserted that the Department of Corrections was "showing deliberate indifference by denying yard." Ford recommended to the Department's director that Winger's appeal be rejected, and the Director, acting through two subordinates, concurred. The Director's ruling was issued on January 9, 2006.

That's the extent of the defendants' involvement in the events underlying Winger's lawsuit, which names the Director (who is now deceased), his two subordinates, the ARB chairperson, the Pontiac warden who approved Winger's punishment and that warden's successor, the facility's grievance officer, and the members of the adjustment committee involved in disciplining Winger. Winger did not submit another grievance until June 2006; in that submission (which the defendants deny receiving) he did not ask for any relief and explained that his use of the recreation yard was about to be restored and thus the point of the grievance was "to document" the denial of "yard activity" except for an hour he was allowed in late April 2006.

That opportunity came about through Winger's communications with his counselor and a prison psychiatrist, neither of whom is a defendant or provided evidence in this litigation. A letter from Winger to his counselor dated April 15, 2006, recounts that twice, in January and March, he had discussed the denial of "outside yard" with the psychiatrist, who reported back that the "house lieutenants . . . apparently could not" authorize yard time. Winger complained in this letter about physical illness, depression, and panic attacks, which he implied could be traced to his exclusion from the recreation yard, though not specifically to a lack of physical exercise. Two weeks later, on April 30, Winger was allowed to spend an hour in the recreation yard, and afterward he wrote another letter to the counselor thanking him for interceding. After that Winger continued to meet with the psychiatrist, who, Winger admits, told him it was likely that his anxiety was partly due to a charge of solicitation to commit murder, which by then state prosecutors had filed. Winger first appeared in state court on that charge in May 2006, and he was convicted and sentenced to another 35 years in prison in 2007. *See People v. Winger*, No. 4-09-0523, 2011 WL 10468205, at *3 (Ill. App. Ct. Jan. 26, 2011).

Winger was transferred to another prison at some point in June 2006, and soon after this move his recreation privileges were restored. He then filed this lawsuit, alleging that he suffered panic attacks, depression, and other physical and psychological symptoms because of the restriction on outdoor recreation. We understood Winger to claim that the defendants had prevented him from exercising during his year in segregation, leading to these impairments. This was enough for his complaint to survive screening, *see* 28 U.S.C. § 1915A, but we also recognized that Winger might face any number of hurdles to prevailing on the merits. We noted, for example, that Winger may have had adequate opportunities for indoor exercise or, alternatively, his punishment might have been justified by legitimate penological interests. *See Winger*, 325 F. App'x at 436.

After our remand the defendants deposed Winger, and both sides moved for summary judgment. At his deposition Winger testified that while in segregation he was

confined to cells measuring about 6 feet by 12 feet in which the area available for exercise was about 2 feet by 10 feet. He had attempted jumping jacks and running in place in this space, he said, but found it very difficult without banging his knees or elbows on either the bunk or the cell walls. He also testified that exercise was difficult due to the lack of air circulation and stifling heat in both the summer and winter. Winger further claimed that the filthy condition of his cell and poor air quality, which he attributed to human waste and the pepper spray used on unruly inmates, hindered his exercises. He testified that he had also attempted sit-ups and other exercises on his bed but that this left the bed soaked in sweat. He noted, too, that the floor was too narrow for push-ups and was contaminated by feces, urine, mouse and cockroach droppings, and cockroaches.

Despite this testimony, which the defendants did not contest (and cited extensively in their statement of undisputed facts), the district court concluded that a jury could not reasonably find that Winger was unable to exercise adequately in his cell. And if that conclusion was incorrect, the court added, the defendants nonetheless were entitled to summary judgment because Winger lacked evidence that they knew of any harm to him. Moreover, the court said, Winger did not present evidence that his alleged physical injuries (which the court characterized as "de minimis") and mental-health issues were caused by the denial of yard privileges.

On appeal Winger challenges the grant of summary judgment for the defendants and also contends that the district court should have recruited counsel to assist him. We cannot conclude that the court abused its discretion by declining to seek a lawyer. Winger had asserted that counsel was essential because, he said, the case is complex and his panic attacks would hinder his ability to present the matter to a jury. He also points out here, as he did in the district court, that an attorney could have assisted in locating an expert to establish a link between the deprivation of yard time and his panic attacks. As the district court noted, however, Winger (who worked as a nuclear engineer before his incarceration) had capably advocated for himself throughout the proceedings, even winning a reversal of the dismissal of his suit. And although Winger may have encountered difficulty securing an expert, an inmate may rely on his treating physicians for medical evidence. *See Gil v. Reed*, 381 F.3d 649, 660 (7th Cir. 2004). In light of the high quality of Winger's filings and the straightforward nature of his Eighth Amendment claim, the district court reasonably denied his motion for appointment of counsel. *See Romanelli v. Suliene*, 615 F.3d 847, 852–53 (7th Cir. 2010).

On the merits the district court's analysis raises concerns. For one, the court erred in suggesting that Winger could not prevail on his Eighth Amendment claim because, the court thought, his physical injuries were trivial. We have repeatedly rejected the notion that

"de minimis" physical harm is not actionable in a prisoner civil-rights suit. *See Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012); *Washington v. Hively*, 695 F.3d 641, 642–43 (7th Cir. 2012); *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012). We also are skeptical of the court's conclusion that a jury could not find that Winger lacked the ability to exercise in his cell. Although a jury might reasonably conclude that Winger was able to exercise adequately on his bed or in the narrow space beside it, his deposition testimony that he couldn't run in place or do jumping jacks for more than a few minutes before banging his knees and shoulders on the walls is enough to raise a triable issue of fact.

Still, we agree with the district court that none of these defendants (including the Director's subordinates who were dismissed on the basis of the statute of limitations) could be liable for the claimed Eighth Amendment violation. Early on Winger protested to some of the defendants that his loss of yard privileges would exceed the duration allowed under state law, but § 1983 is not a means of enforcing state law or recovering for its violation. *See Waubanascum v. Shawano County*, 416 F.3d 658, 666 (7th Cir. 2005); *Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003). Winger did not file any grievance specifically complaining that his cell was too small to accommodate exercise, nor did he complain in a grievance about panic attacks or other consequences of a lack of exercise. Indeed, as far as this record shows, the only people Winger sought help from were his counselor and the prison psychiatrist, who then arranged for him to spend an hour in the prison yard. And there is no evidence that the counselor and psychiatrist intervened with the named defendants to win that brief reprieve.

Winger averred at his deposition that he told Melody Ford, the ARB chairperson, about his physical and psychological symptoms during her video interview in December 2005. But that interview was conducted for the purpose of adjudicating Winger's wide-ranging grievance challenging the disciplinary proceeding on a number of substantive and procedural grounds. His grievance protested the yard restriction only because he thought that state law limited its duration to 90 days, and at his deposition Winger did not assert that he told Ford that the yard restriction was causing his health issues. In fact, during that deposition, Winger conceded that no doctor ever had attributed his ills to the denial of yard time. *See Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (noting that inmate was not competent to testify on relation between exercise and dental problems); *Gruenberg v. Schneiter*, 474 F. App'x 459, 463 (7th Cir. 2012) (affirming grant of summary judgment in favor of defendants where inmate presented no admissible evidence linking muscle pain and depression to exercise deprivation).

The scant information Winger says he disclosed to Ford is too little for a jury to find that she knew that the lengthy yard restriction was causing harm or even impeding his ability to exercise. And concerning the other defendants, Winger produced no evidence

that they knew about any of the health issues he attributes to the yard restriction. Nor does he point to evidence that the defendants knew that he lacked room in his cell to exercise adequately (a problem Winger attributes to his "particular build"). Although Winger insists that the health risks of his confinement were obvious and cites precedent from other circuits for the proposition that a prolonged deprivation of out-of-cell exercise is per se unconstitutional, we have held only that denying opportunities for exercise *may* violate the Eighth Amendment "in certain limited circumstances where movement is denied and muscles are allowed to atrophy and the health of the individual is threatened." *Thomas v. Ramos*, 130 F.3d 754, 763 (7th Cir. 1997) (citation, quotation marks, and alteration omitted). We have noted that in-cell exercise may serve as an alternative to out-of-cell exercise, *see Pearson*, 237 F.3d at 890 (Ripple, J., concurring)*; Ramos*, 130 F.3d at 763, and required inmates claiming deliberate indifference to show that prison officials knew that the inmates' health was threatened, *see Pearson*, 237 F.3d at 887 (reversing punitive-damages award where trial record did not support finding that prison superintendent was aware of risk to plaintiff's well-being from year-long denial of yard privileges); *cf. Delaney v. DeTella*, 256 F.3d 679, 686 (7th Cir. 2001) (affirming denial of summary judgment for defendants where plaintiff "repeatedly complained to each of the named defendants" that he lacked meaningful opportunity to exercise).

Accordingly, since intent is essential for liability under the Eighth Amendment, *see Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2012) (en banc), these defendants were entitled to summary judgment. Whether other employees at Pontiac might have been aware of, or could have intervened to prevent, the alleged deprivation of exercise is not a question presented by this appeal. And because Winger did not develop evidence tying these defendants to the harms he allegedly suffered, neither is it necessary to explore whether his evidence was enough for a jury to find that those harms resulted from a lack of out-of-cell exercise.

**AFFIRMED**.