In the

# United States Court of Appeals
## for the Seventh Circuit

———————————

No. 18-3535

MICHAEL JOHNSON,

*Plaintiff-Appellant,*

*v.*

SUSAN PRENTICE, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Central District of Illinois.
No. 16-C-1244 — **Colin S. Bruce**, *Judge.*

———————————

On Petition for Rehearing and Rehearing En Banc

———————————

DECIDED AUGUST 25, 2022

———————————

Before SYKES, *Chief Judge,* and EASTERBROOK, ROVNER, WOOD, HAMILTON, BRENNAN, SCUDDER, ST. EVE, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges.*

On consideration of the petition for panel rehearing or rehearing en banc filed May 18, 2022, Chief Judge Sykes and Circuit Judges Easterbrook, Brennan, Scudder, and Kirsch

voted to deny rehearing en banc. Circuit Judges Rovner, Wood, Hamilton, St. Eve, and Jackson-Akiwumi voted to grant rehearing en banc. On the tie vote, the petition for rehearing en banc is DENIED. The petition for panel rehearing is DENIED.

SCUDDER, *Circuit Judge*, concurring in the denial of the petition for rehearing *en banc*. Michael Johnson asks the full court to revisit our 2001 decision in *Pearson v. Ramos*, 237 F.3d 881, and therefore to reconsider the standard for determining the point at which denying a prisoner access to exercise offends the Eighth Amendment. In my view, this case is not the best candidate for *en banc* review because the record, perhaps owing to Johnson representing himself in the district court, is underdeveloped on points of fact and law essential to proper consideration of such a difficult question. Make no mistake, though: the issue is important and cries out for the full court's consideration in a future case.

What makes the question presented so difficult is that it does not seem amenable to a categorical answer at either bookend. To my eye, *Pearson* is too broad: it suggests that the proper Eighth Amendment focus is not on the cumulative effect of disciplinary infractions, which can result in a prisoner losing access to exercise for months or years on end, but rather on whether each individual instance of misconduct warranted denying that access for some lesser increment of time. See *id.* at 886. *Pearson*, in short, seems to say that the Eighth Amendment is not concerned with the sum total of the deprivation so long as each component is not problematic when measured in isolation. It is hard to square that view with the Supreme Court's observation in *Wilson v. Seiter* that "[*s*]*ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." 501 U.S. 294, 304 (1991) (emphasis in original).

Nor does the question presented seem amenable to an equally categorical answer at the other end of the spectrum—that the deprivation of access to exercise always violates the Eighth Amendment once some point in time is surpassed. So much would seem to depend on how two primary variables intersect: the safety risk presented by the prisoner and the harm he suffers from being unable to exercise, either on the yard or in a larger cell, over the length of time at issue.

My point is that broad rules (akin to always and never answers) are most often the exception and not the norm on difficult questions of law. At the very least, categorical answers in any direction seem at odds with the established preference of resolving Eighth Amendment challenges to prison conditions on their individual facts with legal guideposts informing the proper inquiry. See *Farmer v. Brennan*, 511 U.S. 825 (1994).

Getting to the right legal standard requires a case where the facts and law have benefitted from full development and sound adversarial presentation in the district court. At a minimum, it seems a record would benefit from evidence on these points:

- Why and for how long did the prisoner lose access to exercise?

- Was the loss of access just to the prison yard or also to indoor spaces, including oversized cells, that would have allowed some forms of exercise?

- What risks—security or otherwise—did the institution face by affording the prisoner access to

exercise? Was the institution unable to manage those risks? Did the answer change over time?

- What was the physical and mental impact of the deprivation on the prisoner and how did it change over time? These points seem especially amenable to being informed by expert testimony on the importance, if not necessity, of exercise to some baseline of physical and mental well-being.

- What institutional policies exist around eliminating access to exercise, and did the deprivation in question reflect implementation of those institutional policies? This question may inform the prospect of municipal liability, especially where it may be difficult to identify any one decision maker responsible for the cumulative effect of the denial of access to exercise. See *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658 (1978).

It is also easy to foresee how a deprivation of access to exercise may intersect with other detrimental and equally serious conditions, including prolonged solitary confinement.

This case, then, is by no means the final word. To the contrary, we will await another appeal with a more developed record that will afford the full court an opportunity to answer the important and unresolved question we decline to resolve today.

WOOD, *Circuit Judge*, with whom ROVNER, HAMILTON, ST.
EVE and JACKSON-AKIWUMI, *Circuit Judges*, join, dissenting
from the denial of rehearing *en banc*. In a civilized country,
even prisoners cannot be deprived of what the Supreme Court
calls the "minimal civilized measure of life's necessities." See
*Wilson v. Seiter*, 501 U.S. 294, 298 (2001) (quoting *Rhodes v.
Chapman*, 452 U.S. 337, 347 (1981)). However badly behaved a
prisoner may be, actions such as starvation, torture, depriva-
tion of essential healthcare, and failure to provide life-sustain-
ing warmth (or cooling), are out of bounds for the prison au-
thorities. The case now before this court focuses on another
one of those necessities: exercise. *Wilson* confirms that exercise
is on the list of "minimal" needs that must be addressed. *Id.*
at 304.

The majority's opinion, however, has taken the liberty of
deleting "exercise" from the prison's responsibilities. It holds
instead that Michael Johnson's right to some minimal level of
exercise can be withdrawn from him for a period of more than
*two years*, because (as all agree) Johnson is an obstreperous,
violent person. No decision from either the Supreme Court or
the lower courts justifies our carving out exercise from the Su-
preme Court's list. Indeed, the majority's decision puts the
Seventh Circuit at odds with many other courts and thus
makes this case a suitable candidate for Supreme Court atten-
tion. See S. CT. R. 10(a).

As far back as 1979, then-Judge Anthony Kennedy, writ-
ing for a panel of the Ninth Circuit, recognized that the total
deprivation of exercise "for a period of years" is an impermis-
sible form of punishment under the Constitution. *Spain v.
Procunier*, 600 F.2d 189, 200 (9th Cir. 1979); *cf. Davis v. Ayala*,
576 U.S. 257, 286–90 (2015) (Kennedy, J., concurring). Today,

by my count, the Second, Fourth, Fifth, Eighth, and Ninth Circuits all recognize some minimal opportunity to exercise as one of life's necessities.[1] As best I can determine, only the Eleventh Circuit might be on the other side, but it has not reconsidered this issue since the Supreme Court handed down *Wilson*, and so may by now have a different position. See *Bass v. Perrin*, 170 F.3d 1312, 1317 (11th Cir. 1999).

Moreover, a brief review of the facts confirms (contrary to the concerns expressed by the concurring opinion) that there are no quirks in the record of this case that stand in the way of our reaching this issue. See *Johnson v. Prentice*, 29 F.4th 895 (7th Cir. 2022). Imprisoned since 2007, Johnson was often violent, disruptive, and destructive, engaging in such behaviors as fighting, possessing contraband, damaging property, attacking guards with feces and urine, disobeying orders, and

---

[1] See *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996) (recognizing a longstanding circuit rule that "some opportunity for exercise *must* be afforded to prisoners"); *Mitchell v. Rice*, 954 F.2d 187, 191 (4th Cir. 1992) (recognizing both the general principle that "complete deprivation of exercise for an extended period of time violates Eighth Amendment prohibitions against cruel and unusual punishment" and a narrow security exception); *Lyles v. Stirling*, 844 F. App'x 651, 653–54 (4th Cir. 2021) (noting the continued force of the general principle established in *Mitchell*); *Hewitt v. Henderson*, 271 F. App'x 426, 428 (5th Cir. 2008) (summarizing circuit precedent to hold "that deprivation of exercise may constitute an impairment of health, which is actionable under the Eighth Amendment" and that such claims should be evaluated in light of "(1) the size of the inmate's cell; (2) the amount of time the inmate spends locked in his cell each day; and (3) the overall duration of the inmate's confinement"); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) ("[L]ack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened."); *Thomas v. Ponder*, 611 F.3d 1144, 1152 (9th Cir. 2010) (reaffirming *Spain*).

insolence. This behavior earned him a lengthy stint in disciplinary segregation, for which he was transferred to Pontiac in March 2013. Once at Pontiac, he continued to misbehave, and so he accumulated additional conduct violations that led to consecutive periods in disciplinary segregation. This meant "that Johnson spent almost three and a half years—from March 2013 to August 2016—in solitary confinement. (He was also sanctioned with restrictions on his yard access … .)" *Id.* at 900.

Normally, inmates subject to segregation are given permission to exercise outside their cells for a few hours each week, *id.*, or, at a bare minimum, they have enough room within their cells to engage in limited exercise. As the majority does, I will refer to the out-of-cell activities as "yard" privileges. I will specify when in-cell activities are relevant. Because this case reaches us from a grant of summary judgment for the defendants, we must accept for present purposes Johnson's account of any disputed facts. That means we must accept the fact that Johnson's cell was too small to permit in-cell exercise—in other words, on this record, it was exercise out of the cell (*i.e.*, in the yard) or nothing.

The key issue before us, on that understanding, is whether there is a limit on how long yard privileges may be revoked entirely, when yard time constitutes the prisoner's *only* meaningful opportunity to exercise. It is hard to avoid the conclusion that there is indeed such a limit, given the recognition in *Wilson* that "exercise" is a fundamental necessity. The only serious issue is whether a jury could find that the deprivation Pontiac imposed on Johnson exceeded that limit. It is common ground between the majority and me that Johnson was "almost continuously" prohibited from yard access "from about

January 2014 through August 2016." *Id.* While an inmate is under yard restrictions, Pontiac permits him only one hour of out-of-cell exercise per month, but even this paltry amount was frequently denied to Johnson. *Id.* at 900–01. "He contended that between June 2015 and June 2016 he was not permitted *any yard access at all*." *Id.* at 901 (emphasis added). The record also indicates that inmates in disciplinary segregation were permitted one ten-minute shower per week, but no one contends that this qualifies as exercise time.

The panel majority has attempted to avoid the question Johnson has presented in his briefs by recharacterizing it as a challenge to prolonged solitary confinement. See *id.* at 902–04. It asserts that there is a sharp break between Johnson's theories in the district court, which concerned specific conditions such as the lack of opportunity to exercise (and which he advanced *pro se*), and his argument on appeal, which the majority characterizes as one about solitary confinement.

But that is not a fair reading of Johnson's argument, either in the district court or before this court. Johnson is asserting that he had exactly *zero* time outside his cell that he could use for purposes of exercise, and he is also contending that in-cell exercise was impossible. It is easy enough to see a factual link between his exercise argument and an argument about confinement to the cell, but it is not unusual for one set of facts to underlie two or more legal theories. His lengthy confinement to his cell provides important context for his exercise claim.

In making that connection, it is worth recalling that the Supreme Court in *Wilson* acknowledged the importance of context:

> Some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

501 U.S. at 304 (emphasis deleted). As applied here, Johnson has focused not on any generalized problems with solitary confinement, serious and troublesome though they may be, but instead on the total deprivation of meaningful exercise opportunities, either in or out of his cell, for an extended time.

The length of the deprivation is relevant. No one is saying that a 24-hour deprivation, or even a deprivation lasting two or three weeks, automatically violates the Eighth Amendment, any more than one would say that the Constitution entitles Johnson to a state-of-the-art gym. But somewhere between three weeks and two years, the constitutional line is crossed. At this stage of the litigation, we must credit Johnson's assertion (based on personal knowledge) that he was *totally* deprived of exercise for more than two years. That happened because of the prison's decision to impose back-to-back terms of confinement to his cell. Maybe that was a convenient punishment, but at some time well short of two years, it became an unconstitutional one—just as unconstitutional as if the prison had decided to punish Johnson by refusing to feed him or by keeping the temperature in his cell at 40 degrees Fahrenheit. See *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The legal issue that is sharply presented in this case is whether a prison is entitled to deprive an inmate of any of the *basic necessities* of human life as punishment for bad behavior.

The majority answers that question in the affirmative, but that squarely conflicts with *Wilson* and the decisions of the other circuits noted earlier. If this case involved any of the other basic necessities—food, medical care, warmth—we would not be having this discussion. No matter how obstreperous Johnson was, no matter how violent or inappropriate his behavior, the Eighth Amendment does not permit the deprivation of the basic necessities of human existence. Exercise, the Supreme Court has said, is one of those necessities. Only the Court has the authority to delete it from that list.

The concurrence to the denial of Johnson's petition for rehearing agrees that "determining the point at which denying a prisoner access to exercise offends the Eighth Amendment … is important and cries out" for review, but insists that the record is too underdeveloped to permit *en banc* review. *Ante* at 3 (Scudder, J. concurring in the denial of rehearing *en banc*). Under the panel majority's view, however, the factual details that the concurrence claims are essential to review—such as whether an inmate lost access to all or only some exercise spaces, whether the prison could manage any security risk associated with allowing exercise, and the physical and mental impact of the deprivation on the inmate—are irrelevant. That is because the panel majority held that completely depriving an inmate of exercise for two years does not violate the Eighth Amendment as a matter of law so long as the inmate has committed a "serious" offense. *Johnson*, 29 F.4th at 904–05. No deficiency in the record prevents us from correcting this sweeping holding.

I conclude with a few words about *Pearson v. Ramos*, 237 F.3d 881 (7th Cir. 2001). If it indeed compels the result here, then it too should be overruled by the *en banc* court of appeals.

That said, it may be possible to distinguish it on its facts, as I now explain.

The plaintiff in *Pearson* was seeking damages for the harm he suffered "as a result of being denied access to the prison yard for exercise for an entire year." *Id.* at 883. A majority of the panel reversed a jury verdict in Pearson's favor on the ground that the record did not reveal circumstances that amounted to cruel and unusual punishment. Judge Ripple, concurring in the judgment, would have found qualified immunity for the prison officials, not because he had ruled out a constitutional violation, but instead because any such right was not yet, in his view, clearly established. The panel majority portrayed the "dispositive issue" as "whether the stacking of … sanctions to the point of depriving a prisoner of an entire year of yard access is cruel and unusual punishment." *Id.* at 884. It held that a single 90-day denial of yard privileges did not amount to such punishment, but then (problematically) said that four consecutive denials of 90 days apiece similarly could not be understood as cruel and unusual punishment. *Id.* at 885. What else was the prison to do, the majority asked, faced with a violent and incorrigible inmate? *Id.*

But that takes us right back to the distinction between deprivation of yard privileges and deprivation of *all* opportunities to exercise. A closer look at *Pearson* shows that the plaintiff there, unlike Johnson, had some residual opportunities for movement outside his cell. The *Pearson* majority reported that there was "no credible evidence … of any physical or psychological harm to the plaintiff as a result of his protracted confinement in the segregation unit … ." *Id.* at 886. Second, as footnote 3 to the concurring opinion notes, the yard was not

Pearson's only outlet—he had some opportunities to leave his cell for other purposes:

> Over the course of the year, Mr. Pearson left his cell at least four times a month and more often seven or eight times a month, either to take showers (generally once a week), to visit family members, to go to the law library, or to visit the health center. Whenever he left his cell, Mr. Pearson's legs were shackled and his arms restrained by chains. "Any walking he did outside his cell would have been little more than a shuffle." R.88 at 2. During the first 90–day period, Mr. Pearson left his cell at least 23 times for a total of 31.7 hours. (Although prison records show that Mr. Pearson was given 3 hours of yard time on February 14, 1994, Mr. Pearson denies that this occurred.) During the second 90 day period, Mr. Pearson left his cell at least 20 times for a total of about 33 hours away from it. The prison was under a lockdown for 33 days during this period. During the third 90–day period, Mr. Pearson left his cell at least 16 times for a total of 32.5 hours. The prison was under a lockdown for 28 days during this period. Finally, during the fourth 90–day period, Mr. Pearson left his cell 13 times for a total of 24 hours. The prison was under a lockdown for 42 days during this period.

*Id.* at 888 n.3 (Ripple, J., concurring in the judgment). Yet at a different point, the concurring opinion recognized that Pearson too may have been faced with a complete deprivation of exercise: "The existence of out-of-cell exercise must also be taken into consideration. … But it seems less than certain that he could exercise in any meaningful way in his cell. Notably, the district court stated that Mr. Pearson's cell was 'too small

for meaningful exercise.'" *Pearson*, 237 F.3d at 890 (Ripple, J. concurring).

The more faithful reading of *Pearson* thus shows that it makes the same mistake that the majority is making here, by failing to give effect to the Supreme Court's recognition that exercise is a basic need. This is an error that the *en banc* court can and should correct.

The *Johnson* majority also overreads *Pearson* in its discussion of the reasons that might justify a total deprivation of yard privileges and the opportunity to exercise. Speaking of the norm of proportionality found in the Eighth Amendment (pursuant to which some forms of punishment that are permitted for serious crimes may violate the clause if imposed for trivial ones), the *Pearson* majority stated that it "could imagine the norm's being violated by imposing a 90-day denial of yard privileges for some utterly trivial infraction of the prison's disciplinary rules … ." *Id.* at 885. The imposition of a severe sanction for an "utterly trivial" violation would certainly be *sufficient* to show an Eighth Amendment violation, but the *Pearson* panel never said that this was *necessary*. Deprivation of an essential human need is not acceptable even for major transgressions. Again, we are confusing two things: what measures is the prison entitled to use in a punitive way, and when do its actions reach the point at which there is a deprivation of the minimal civilized necessities of human life? Prisons are entitled to use proportionate sanctions within a wide range, but the Eighth Amendment still insists that the basics of human life be furnished.

This may be a low bar, but in my opinion Johnson showed enough to defeat the motion for summary judgment. In finding to the contrary, the majority has failed to observe the

distinction between the minimal necessities of life and other sanctions. Depriving an inmate of the former is incompatible with the Eighth Amendment. We are making a grave mistake by failing to clarify, and then to follow, the difference between those two standards. Regrettably, this opinion sends the message that an inmate who behaves as badly as Johnson did is now fair game for torture, or starvation, or medical neglect, or wholesale deprivation of exercise. The Eighth Amendment assures that minimal human standards cannot be compromised. I respectfully dissent from the *en banc* court's decision not to correct this error.